87 P.3d 680 (2004)
192 Or. App. 604
In the Matter of Marcus Nicholls, a Minor Child.
STATE ex rel. JUVENILE DEPARTMENT OF MULTNOMAH COUNTY, Appellant,
v.
Marcus NICHOLLS, Respondent.
9401-80039, A119871.
Court of Appeals of Oregon.
Argued and Submitted November 10, 2003.
Decided March 31, 2004.
*681 Robert B. Rocklin, Assistant Attorney General, argued the cause for appellant. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
*682 Daniel A. Cross argued the cause for respondent. With him on the brief was The Law Offices of Daniel A. Cross.
Before HASELTON, Presiding Judge, and LINDER and ORTEGA, Judges.
LINDER, J.
In this juvenile delinquency proceeding, the state appeals an order releasing youth from the custody of the Oregon Youth Authority (OYA). The juvenile court concluded that 1995 statutory amendments permitting the juvenile court to exercise jurisdiction over youth offenders until age 25, instead of the previous limit of age 21, violate constitutional ex post facto principles as applied to youth. On appeal, we do not reach the constitutional question because we agree with youth's alternative argument that the legislature did not intend for the 1995 amendments to apply retroactivelythat is, to youth offenders whose delinquent acts predate the effective date of the amendments. We therefore affirm on that alternative ground.
The pertinent facts are primarily procedural. In 1994, youth was found to be within the juvenile court's jurisdiction for committing acts that, if committed by an adult, would constitute the crimes of first-degree unlawful sexual penetration, ORS 163.411(1)(b), and first-degree sexual abuse, ORS 163.427(1)(d). Youth committed those acts in 1993. In its initial dispositional order, the juvenile court placed youth on probation for a period of two years. Later, the juvenile court twice extended the period of probation. Then, in 1997, the juvenile court revoked youth's probation after concluding that youth "is a danger to the community and needs secure treatment." In its 1997 order, the juvenile court committed youth to "the legal custody of the Oregon Youth Authority (OYA) * * * for placement in a training school until the youth's twenty-fifth birthday, but said period shall not extend beyond the date on which the youth becomes 25 years of age."
After youth's twenty-first birthday, he filed a motion in the juvenile court seeking immediate release from OYA's custody and from confinement at MacLaren Youth Correctional Facility. In support of his motion, youth relied on the fact that, at the time he committed the delinquent acts and was found to be within the jurisdiction of the juvenile court, the juvenile code provided that no disposition by a juvenile court could extend beyond the date on which a youth offender became 21 years old. ORS 419C.501 (1993), amended by Or. Laws 1995, ch. 422, § 85. After youth's adjudication, the juvenile code provisions were amended to provide that juvenile court jurisdiction could be exercised until a youth offender becomes 25 years old. ORS 419C.005(4)(d) (1995); ORS 419C.501 (1995).[1] According to youth, that statutory change cannot apply to him because, so applied, it would violate state and federal constitutional ex post facto prohibitions. The juvenile court agreed and ordered that youth be released immediately from OYA's custody.[2]
*683 On appeal, the parties reprise the constitutional arguments that they made to the juvenile court. In addition, youth asserts that the juvenile court's order can be affirmed on an additional or alternative ground not presented belowviz., that the 1995 change was not intended to apply to youth offenders whose offenses predate the effective date of the pertinent amendments.[3] More specifically, youth argues that the legislature did not expressly make the amendments retroactive, that the legislative history does not suggest that the legislature intended the amendments to apply retroactively, and that, given the silence of the text and the legislative record, the amendments must be presumed to apply only prospectively because they affect legal rights and obligations arising out of past actions.
In response to youth's alternative argument, the state makes two arguments. First, the state asserts that applying the lengthened period of juvenile court jurisdiction to youth offenders who committed their delinquent acts before the effective date of the change is not accurately characterized as a "retroactive" application. Second, and alternatively, the state asserts that the amendments are remedial in nature and, consistently with the legislature's purpose in enacting them, the amendments should apply to all youth offenders who were subject to the juvenile court's jurisdiction on the amendments' effective date, regardless of when they committed their delinquent acts.
We begin with the state's threshold proposition that, "[a]lthough it is not obvious," applying the 1995 amendment to youth does not present a retroactivity problem. The state relies on our observation in Vloedman v. Cornell, 161 Or.App. 396, 399, 984 P.2d 906 (1999), that the notion of retroactivity is a "somewhat slippery one" and that all laws operate retroactively "in the sense that they determine the legal significance of past events." As we further explained in Vloedman, courts sometimes use the term in two senses, one broad and one narrow. In the broad sense, the term "retroactive law" refers to any enactment that changes, from its effective date forward in time, the legal effect of past actions. Id. In the narrow sense, the term is limited to enactments that change the effect of past actions automatically upon passage. Id. Significantly, Oregon jurisprudence uses the term in its broadest sense that is, to refer to any enactment that changes, from its effective date forward in time, the legal effect of past actions. Id. Arguably, this amendment, if applied to youth and others similarly situated, satisfies both the broad and narrow uses of the term "retroactivity." But in all events, it qualifies as "retroactive" in the way that Oregon courts use the term.[4]
We turn, then, to the principles that guide the analysis of whether a statutory enactment is retroactive or prospective in its application. The inquiry focuses on what the legislature intended, and we follow our usual methodology for construing statutes in *684 making that determination. State v. Lanig, 154 Or.App. 665, 670, 963 P.2d 58 (1998). Specifically, we look first to text and context and, in the absence of an express retroactivity clause, we consider such textual cues as verb tense and other grammatical choices that might suggest what the legislature had in mind. Id. at 671-73, 963 P.2d 58; Newell v. Weston, 150 Or.App. 562, 569, 946 P.2d 691 (1997), rev. den., 327 Or. 317, 966 P.2d 221 (1998). We also consider whether the legislature, elsewhere in the same bill, included any express retroactivity provisions, a fact that is not necessarily dispositive but can be telling. Ritcherson v. State of Oregon, 131 Or.App. 183, 186, 884 P.2d 554 (1994), rev. den., 320 Or. 507, 888 P.2d 568 (1995).
If text and context are inconclusive, we next consider legislative history. Lanig, 154 Or.App. at 670, 963 P.2d 58. Not surprisingly, when a statute lacks an express retroactivity clause, the legislative record is typically silent and of no assistance. The analysis therefore often moves past that step in short order and on to maxims of construction. See, e.g., Rhodes v. Eckelman, 302 Or. 245, 248, 728 P.2d 527 (1986); Vloedman, 161 Or.App. at 400, 984 P.2d 906; Lanig, 154 Or.App. at 674, 963 P.2d 58; Ritcherson, 131 Or.App. at 186, 884 P.2d 554. In effect, maxims are rules or aids of construction that assist us in determining probable legislative intent when it is impossible to discern from a statute itself whether the legislature intended it to apply retroactively. Whipple v. Howser, 291 Or. 475, 481, 632 P.2d 782 (1981).
The maxims that apply in a particular instance depend in part on the substance of the enactment. See, e.g., Ritcherson, 131 Or.App. at 187, 884 P.2d 554 (applying special rules of construction to an amendment of a statute of limitations provision). If, for example, given a particular enactment's substance, retroactive application would give rise to a serious concern as to the provision's constitutionality, we avoid that construction. Lanig, 154 Or.App. at 674, 963 P.2d 58. Similarly, if retroactive application would lead to an anomalous or strained outcome, we do not assume in the face of linguistic and historical silence that the legislature intended that outcome. Rhodes, 302 Or. at 249, 728 P.2d 527; State v. George, 127 Or.App. 581, 585-86, 873 P.2d 468 (1994). But most often we are left to examine whether a provision is "remedial" versus "substantive" in nature. If it is remedial, it presumptively applies retroactively; if it is substantive, it presumptively applies prospectively only. See, e.g., Joseph v. Lowery, 261 Or. 545, 548-49, 495 P.2d 273 (1972); Black v. Arizala, 182 Or.App. 16, 31-32, 48 P.3d 843, rev. allowed, 335 Or. 104, 59 P.3d 1279 (2002); Vloedman, 161 Or.App. at 401, 984 P.2d 906; Newell, 150 Or.App. at 568-69, 946 P.2d 691. In determining whether a particular enactment is remedial or substantive, we avoid invoking the terms as mere labels and strive instead to examine meaningfully the substance of the legislation. Joseph, 261 Or. at 548-49, 495 P.2d 273; Newell, 150 Or.App. at 568-69, 946 P.2d 691.
In this case, we agree with youth and the state that neither the text of the amendment nor its legislative history answers whether the legislature intended the expanded period of juvenile court jurisdiction to apply retroactivelythat is, to youth offenders who committed their delinquent acts before the amendments went into effect. Text and context do, however, provide two important cues to the analysis. First, as we have emphasized in other cases, the lack of an express retroactivity clause is itself important, because such clauses are commonplace and easy to draft in concept as well as in practice. Lanig, 154 Or.App. at 671, 963 P.2d 58; see also Rhodes, 302 Or. at 249, 728 P.2d 527; Newell, 150 Or.App. at 569, 946 P.2d 691. Textual silence alone therefore strongly suggests that the legislature either did not intend the statute to be retroactive or did not consider the matter. Boone v. Wright, 314 Or. 135, 138, 836 P.2d 727 (1992). Second, and relatedly, elsewhere in Senate Bill (S.B.) 1 (1995), the bill that contained the amendments in question, the legislature did insert an express retroactivity clause for a different provision. Or. Laws 1995, ch. 422, § 49.[5] *685 Given the breadth and length of the bill, the existence of that express provision does not establish conclusively that the legislature intended thisor any of the other more than 100 sections of the billto apply prospectively only. Its existence does, however, add force to that suggestion. See Ritcherson, 131 Or.App. at 186, 884 P.2d 554 (retroactivity provision for a portion of an amendment was relevant, although not dispositive, in determining the legislature's intent regarding other portions). Thus, although text and context are not decisive, they weigh against construing the amendments to be retroactive.
With that recognition, and because no legislative history assists us, we turn to applicable maxims of construction. In that regard, the parties take sharply divergent views of the 1995 amendments. Youth argues that the amendments, if applied to him and to others similarly situated, would change the legal consequences that attach to him based on his past conduct or transactions (i.e., it would change the length of time that his liberty interests are impaired by juvenile court jurisdiction over him based on his delinquent acts). According to youth, any statutory enactment with that effect is "substantive" and, in the absence of an express legislative retroactivity provision, applies prospectively only. In response, the state relies on the rehabilitative focus of the juvenile justice system generally and on the fact that the legislature expanded juvenile court jurisdiction to age 25 in an effort to reduce recidivist behavior in youth offenders.[6] According to the state, that emphasis on rehabilitation renders the 1995 amendments "remedial" and, consequently, we should conclude that the legislature intended the change to apply retroactivelythat is, to apply to all youths within the juvenile court's jurisdiction, even if their delinquent acts were committed before the amendments' effective date.
Youth, we conclude, has the better of the arguments. To be sure, the juvenile justice system is broadly based on a rehabilitation model rather than a punitive one. See generally State ex rel. Juv. Dept. v. Reynolds, 317 Or. 560, 857 P.2d 842 (1993). But that does not mean that the exercise of juvenile court jurisdiction over a youth offender does not interfere with the youth offender's rights or impose legal obligations on that youth. It does. An adjudicated youth offender does not enjoy the same fundamental freedom of liberty as before the adjudication. See generally In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (because juvenile delinquency adjudication risks significant interference with juvenile's constitutionally protected liberty interests, the proceeding must satisfy the essentials of due process). Certainly, confinement in a secure youth offender facility, as ordered in this case, burdens a youth offender's protected liberty interests.[7] But even when juvenile *686 court jurisdiction over a youth offender results in a disposition of probation or other less restrictive status, the net result is that the youth offender incurs legal obligations and burdens, and the juvenile court acquires power over the youth, that would not otherwise exist. See generally ORS 419C.440 to 419C.507 (describing juvenile court's dispositional authority).[8]
As youth correctly argues, the juvenile court acquires jurisdiction over youth offenders based on their past conduct. ORS 419C.005(1) (1995).[9] When youth engaged in his delinquent conduct, as well as when he was found within the juvenile court's jurisdiction for that conduct, the pertinent statutes provided that juvenile court jurisdiction could not continue beyond a youth offender's twenty-first birthday. ORS 419C.501 (1993). The 1995 amendments changed the juvenile code so that, if applied to youth, youth would become subject to juvenile court jurisdiction for an additional four years (i.e., until he turned 25). ORS 419C.005(4)(d) (1995); ORS 419C.501 (1995). Thus, if the amendments apply, youth would be subject to secure confinement and to other supervisory orders of the juvenile court for four years beyond what the law provided when he committed his delinquent acts. Necessarily, then, the amendments would have the effect of changing the legal obligations and burdens imposed on youth based on his past conduct.
That effect renders the 1995 amendments "substantive" in nature. As the Oregon Supreme Court explained in Joseph, the terms "substantive" and "remedial" are sometimes misleadingly used. 261 Or. at 547-48, 495 P.2d 273; see also George, 127 Or.App. at 585-86, 873 P.2d 468 (labels such as "substantive" or "procedural" provide little assistance). The court emphasized, however, that the important distinction, consistently adhered to in Oregon jurisprudence, is whether application of a new enactment will "`impair existing rights, create new obligations or impose additional duties with respect to past transactions.'" Joseph, 261 Or. at 547, 495 P.2d 273 (quoting Kempf v. Carpenters & Joiners Union, 229 Or. 337, 343, 367 P.2d 436 (1961)). If the enactment has that effect, it is "substantive" and does not apply retroactively unless the legislature expressly so provides. Id. at 549, 495 P.2d 273. That result follows regardless of "whether the change might be `procedural or remedial' or `substantive' in a strictly technical sense." Id. Thus, it is not the label that matters; it is the practical effect of the new enactment. When that effect is to change the legal consequences that attach to past actions, we presume that the legislature intended the change to be prospective only. See, e.g., Black, 182 Or.App. at 32, 48 P.3d 843; Vloedman, 161 Or.App. at 399-401, 984 P.2d 906.
The state nevertheless argues that the 1995 amendments are "remedial," and therefore presumptively retroactive, because the goal of the juvenile justice system is to rehabilitate, not punish, youth offenders. The point does not overcome the problem. The same could be said when the legislature, for example, increases or expands tort liability and the question is whether that changed liability should apply retroactively. General tort damages seek to make an injured person whole, not to punish, and are in that sense remedial. Even so, retroactively increasing tort liability or altering the basis for such liability has the effect of changing the legal consequences that attach to past actions. Such a change is presumptively not retroactive in application. See Wiebe v. Seely, Administrator, 215 Or. 331, 351, 335 P.2d 379 (1959) (statute increasing the recovery limit for wrongful death actions held not to be retroactive).
*687 Moreover, even if further rehabilitation may follow from subjecting a youth offender to a longer period of juvenile court jurisdiction, this statutory change does not achieve that outcome. Nothing in the amendments in question ensures that youth offenders will receive rehabilitative programs or services. The only thing accomplished by these amendments is that juvenile court jurisdictionand thus the interference with a youth offender's liberty interestsextends for a greater period of time. It may be that some greater rehabilitation will flow as a collateral consequence of that extension of juvenile court jurisdiction. But these amendments, in and of themselves, do nothing directly to achieve that effect.
Finally, two additional considerations persuade us that the 1995 amendments should not be applied retroactively. First, to apply them to youth offenders who committed delinquent acts before the 1995 changes took effect would raise a serious constitutional question as to whether the legislature may do so consistently with the ex post facto provisions of either the state or federal constitutions.[10]Lanig, 154 Or.App. at 674-75, 963 P.2d 58 (declining to construe statute to apply retroactively when to do so would give rise to a serious ex post facto issue). Second, we note the potentially anomalous result of applying this change to youths who committed their delinquent acts before the 1995 change took effect. Hypothetically, consider two youth offenders who commit a delinquent act in concert. One of them turns 21 years old on June 29, 1995, the day before these amendments became effective. The other turns 21 years old two days later, on July 1, 1995. Solely by the fortuity of their birth dates, the first youth offender would be released from juvenile court jurisdiction at age 21, while the second youth offender would remain in the juvenile court's jurisdiction until age 25. In other words, despite the fact that the two youth offenders are, in all relevant ways, identically situated, they would be subject to dramatically different maximum periods of juvenile court jurisdiction based on past conduct that was committed in concert at the same point in time. We decline to assume that the legislature contemplated and intended that strained result. See Rhodes, 302 Or. at 249, 728 P.2d 527 (court will not presume retroactive application when it leads to anomalous or strained outcomes).
For all of the above reasons, we conclude that the 1995 amendment extending juvenile court jurisdiction over youth offenders until their twenty-fifth birthdays does not apply retroactively to youth offenders who committed the acts resulting in juvenile court jurisdiction before June 30, 1995.
Affirmed.
NOTES
[1] ORS 419C.005(1) (1993), amended by Or. Laws 1995, ch. 422, § 73, provided for exclusive juvenile court jurisdiction over any person under 18 years of age who is found to have committed an act that is a violation of law. The statute, in its 1993 form, did not set any outer limit on that jurisdiction. The limit was reflected only in ORS 419C.501 (1993), which provided that "[t]he period of any disposition shall not extend beyond the date on which the child becomes 21 years of age."

The 1995 amendments expanded the maximum period of juvenile court jurisdiction by modifying the juvenile code in two places. First, the legislature amended ORS 419C.005 by adding a new subsection placing an outer limit on juvenile court jurisdiction. Specifically, the legislature added subsection (4), stating that juvenile court jurisdiction continues until the juvenile court either dismisses a petition for juvenile court jurisdiction (ORS 419C.005(4)(a) (1995)); transfers the case to adult court (ORS 419C.005(4)(b) (1995)); terminates wardship (ORS 419C.005(4)(c) (1995)); or the youth "becomes 25 years of age" (ORS 419C.005(4)(d) (1995)). Or. Laws 1995, ch. 422, § 73. Second, the legislature amended ORS 419C.501 to provide that "[t]he period of any disposition shall not extend beyond the date on which the youth offender becomes 25 years of age." ORS 419.501 (1995). Or. Laws 1995, ch. 422, § 85.
ORS 419C.005 and ORS 419C.501 have been amended since 1995. Or. Laws 2003, ch. 396, § 98; Or. Laws 1999, ch. 964, § 1. Those amendments are not relevant to our analysis in this case.
[2] The state moved for and was granted a stay of enforcement of the juvenile court's order of release pending the outcome of this appeal.
[3] The state does not dispute that youth's alternative statutory argument, which is purely legal in nature, is one that we may properly consider for the first time on appeal. See Outdoor Media Dimensions Inc. v. State of Oregon, 331 Or. 634, 659-60, 20 P.3d 180 (2001) (explaining circumstances in which appellate courts may affirm trial courts on alternative grounds).
[4] The state also relies on what constitutes a retroactive law for purposes of the federal constitutional ex post facto analysis. Even if that analysis were controllingwhich it is notit would not aid the state. The state relies on Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), which involved a statutory scheme that permitted involuntary civil commitment of criminally convicted persons based on "a determination that the person currently both suffers from a `mental abnormality' or `personality disorder' and is likely to pose a future danger to the public." Id. at 371, 117 S.Ct. 2072 (emphasis in original). Under Oregon's juvenile code, the juvenile court's jurisdiction and dispositional authority depends on the adjudication of a youth's past conducti.e., that the youth committed an act that, if committed by an adult, would be a violation of law. See ORS 419C.005; ORS 419C.478. There is no mandatory new adjudication, as in the Kansas scheme, of a youth offender's current mental health or dangerousness. Thus, the 1995 amendments increasing the maximum period of juvenile court jurisdiction, if applied to youth, are a classic retroactive application under the federal analysisthat is, a law that "applies to conduct completed before its enactment." Johnson v. United States, 529 U.S. 694, 699, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000).
[5] Section 49 of S.B. 1 pertained to a class of youth offenders, based on age and the offense committed, who are subject to adult prosecution and mandatory minimum criminal sentences for their conduct. The provision expressly declares that section 49 applies to those youth offenders who committed their offenses "on or after April 1, 1995." The bill did not go into effect until June 30, 1995. Or. Laws 1995, ch. 422, § 146. The legislature thus expressly made section 49 retroactive, no doubt so that the provisions of that section would have an effective date that was consistent with ORS 137.707.

Worth noting, also, is that section 140 of S.B. 1 expressly made several provisions of the bill effective on January 1, 1996, six months after the effective date of S.B. 1 as a whole. That provision further suggests that the legislature, in enacting the bill, was very aware of the issues regarding the effective dates of the bill's various provisions and addressed those issues expressly when provisions were to take effect on dates other than the effective date of the bill.
[6] The state urges that the 1995 change at issue was designed to reduce recidivist behavior, "[i]n light of the data showing that recidivist criminal behavior occurs most frequently when a person is between the ages of 20 and 25." The quotation on which the state relies comes from a task force report submitted to the legislature during hearings on S.B. 1. See Theodore Kulongoski, Governor's Task Force on Juvenile Justice, Final Report: Hearings, Senate Committee on Judiciary, S.B. 1, 1995 Sess., Ex. D, 15 (Jan. 26, 1995).
[7] See Reynolds, 317 Or. at 572, 857 P.2d 842 (confinement in a youth training school has certain characteristics of criminal prosecution in that it deprives a child of liberty); State v. Thompson, 166 Or.App. 370, 380, 998 P.2d 762, rev. den., 331 Or. 192, 18 P.3d 1099 (2000) ("juvenile adjudications can result in the deprivation of a child's liberty"); State ex rel. Juv. Dept. v. Anzaldua, 109 Or.App. 617, 620, 820 P.2d 869 (1991) (commitment of a youth offender to a training school burdens the youth's liberty interest).
[8] As examples, a youth found to be within the jurisdiction of the juvenile court can be required, among other dispositions, to pay restitution and fines (ORS 419C.450 and ORS 419C.459) and to perform community service (ORS 419C.462). As conditions of probation, the juvenile court may, among other things, restrict the youth's access to family and friends, restrict the youth's occupation and activities generally, and direct with whom the youth may live. ORS 419C.446.
[9] ORS 419C.005(1) provides, in pertinent part, that "the juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and who has committed an act which is a violation" of law. That provision was the same at the time of youth's delinquent conduct.
[10] Article I, section 21, of the Oregon Constitution provides, in part, "No ex post facto law * * * shall ever be passed * * *." Article I, section 10, of the United States Constitution provides, in part, "No state shall * * * pass any * * * ex post facto Law[.]" The parties debate whether the 1995 amendments are punitive and whether the constitutional prohibitions on ex post facto laws are limited to laws imposing punishment for the commission of a crime. See generally United States v. Ward, 448 U.S. 242, 248-49, 100 S.Ct. 2636, 65 L.Ed.2d 742, reh'g den., 448 U.S. 916, 101 S.Ct. 37, 65 L.Ed.2d 1179 (1980) (discussing federal ex post facto analysis); State v. MacNab, 334 Or. 469, 481-83, 51 P.3d 1249 (2002) (discussing state ex post facto analysis). Relying on the rehabilitative focus of the juvenile justice system, the state argues that ex post facto principles have no application in this context. Youth responds to the state's argument, in part, by urging that the focus of the juvenile justice system shifted to a more punitive model in 1995. See, e.g., Theodore Kulongoski, Governor's Task Force on Juvenile Justice, Final Report: Hearings, Senate Committee on Judiciary, S.B. 1, Jan. 26, 1995, Ex. D, 6-7 (proposals include a multi-tier system to allow a "graduated series of sanctions for young offenders"); Hearings, Senate Committee on Judiciary, S.B. 1, Mar. 16, 1995, Ex. A (written testimony of Craig Campbell, Coordinator, Governor's Task Force on Juvenile Justice) (the bill "replac[es] the current policy statement that emphasizes the welfare of the child with a policy statement that emphasizes public safety and personal accountability of the youth offender"). We express no view on the answer to the constitutional issue presented in this case, other than to observe that the challenge raised is a serious one.